EVERGREEN MARINE
CORPORATION, Plaintiff, Appellant,

v.

SIX CONSIGNMENTS OF FROZEN
SCALLOPS, In Rem, et al.,
Defendants, Appellees.

No. 93–1136.

United States Court of Appeals,
First Circuit.

Heard June 9, 1993.

Decided Sept. 17, 1993.

Joseph F. De May, Jr. with whom Cichanowicz, Callan & Keane, New York City, Thomas J. Muzyka, and Clinton &· Muzyka, P.C., Boston, MA, were on brief, for appellant.

Evan Slavitt with whom Hugh J. Gorman III and Hinckley, Allen & Snyder, Boston, MA, were on brief, for appellees.

Before TORRUELLA, SELYA and CYR, Circuit Judges.

CYR, Circuit Judge.

Appellant Evergreen Marine Corporation, an ocean carrier, was fraudulently induced to discharge six consignments of frozen scallops, valued at $1.2 million, to Gloucester Corporation, without taking up possession of the bills of lading. After Gloucester became insolvent, the discharged scallops were seized by appellees Fleet National Bank and Cooperative Centrale Raiffeisen–Boerenleenbank B.A. (hereinafter, collectively, "the Banks"), holders of security interests in Gloucester's after-acquired inventory. The district court entered summary judgment for the Banks on Evergreen's claim for conversion. As we conclude on the present record that Evergreen held a superior claim to the scallops, we vacate the judgment and remand for further proceedings.

# I

## FACTS

■■■ On various dates in 1991, Evergreen contracted with Towamarin, Ltd. to carry six consignments of frozen scallops from Tokyo, Japan to Port Elizabeth, New Jersey. Evergreen thereupon issued order bills of lading, designating Gloucester as "Notify Party." [1] When the scallops arrived at Port Elizabeth, Gloucester represented that it held title to the scallops but that the bills of lading were still in transit. For present purposes, the circumstantial evidence, *infra*, compels the inference that Gloucester's representations of title were false and fraudulent at the time made. *See Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 429–30 (1st Cir.1992) (under Rule 56(c), all reasonable inferences must be drawn in favor of party opposing summary judgment).

Evergreen released the scallops to Gloucester, without taking up the original bills of lading, upon Gloucester's execution of certain indemnity and guarantee agreements ("letters of guaranty"). The letters of guaranty included Gloucester's representations of title to the scallops under the bills of lading; its promise to produce the bills of lading "as soon as [the bills] shall have arrived and/or come into [Gloucester's] possession;" and its agreement to defend and indemnify Evergreen against third party claims.[2] Shortly

---

1. An order bill of lading is a negotiable instrument, issued by the carrier to the shipper at the time goods are loaded aboard ship, which serves "as a receipt that the carrier has received [the] goods for shipment; as a contract of carriage for those goods; and as documentary evidence of title to those goods." *Fuentes v. Sea–Land Services*, 665 F.Supp. 206, 209 (S.D.N.Y.1987). The shipper sends the bill of lading to the intended recipient of the goods (consignee); upon notification that the goods have arrived, the consignee presents the bill to the carrier at the delivery port, and receives the goods in return. Because an order bill is negotiable, however, the consignee or "notify party" designated on the bill of lading is not necessarily the holder of the bill at the time and place of delivery. Under these circumstances, subject to extremely limited exceptions, a carrier which delivers to a "notify party," or to any other person, without taking up and canceling its order bill "remains liable to anyone who has purchased the bill for value in good faith, before or after the improper delivery." G. Gilmore & C. Black, *Admiralty* 110–12 (2d ed. 1975). *See also Allied Chemical Intl. Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 481–82 (2d Cir.1985) (discussing obligations of carrier in maritime documentary transaction), *cert. denied*, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986).

2. The executed letters of guaranty provided:

The above goods were shipped on [the listed vessel] by ... TOWAMARIN, LTD. ... (and consigned to us) but the relevant Bill(s) of Lading have not arrived. We hereby request you to deliver such goods to THE GLOUCESTER CORPORATION (us) without production of the Bill(s) of Lading. In consideration of your complying with our above request we hereby agree as follows:

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability loss or damage of whatsoever nature which you may sustain by reason of delivering the goods to US ... in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the goods as aforesaid to provide you or them from time to time with sufficient funds to defend the same.

\* \* \* \* \* \*

4. As soon as all original Bill(s) of Lading for the above goods shall have arrived and/or come late into our possession, to produce and deliver the same to you whereupon our liability hereunder shall cease.

\* \* \* \* \* \*

/s/ THE GLOUCESTER CORPORATION

after issuing the letters of guaranty and removing the scallops to its Massachusetts warehouse, Gloucester became insolvent; the scallops were seized by the Banks pursuant to their security interests in Gloucester's after-acquired inventory.

On February 7, 1992, a third party, Raiffeisenbank Lekkerkerk Holland ("Dutch Bank"), notified Evergreen that it held the true bills of lading for the six consignments of scallops.[3] Facing liability to Dutch Bank, Evergreen sued the Banks, Gloucester, and the scallops, seeking recovery of the scallops or tort damages for their value.[4] *See Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 806 F.Supp. 291 (D.Mass. 1992). The district court denied admiralty jurisdiction and dismissed Evergreen's Rule D claim against the scallops *in rem*. Upon affirming its diversity jurisdiction, however, the court applied Massachusetts law to Evergreen's remaining claims. *Id.* at 293–94. The court dismissed Evergreen's claim against the Banks for tortious interference with contract, *see id.* at 296, and entered summary judgment for the Banks on Evergreen's conversion and replevin claims, on the ground that the Banks' perfected security interest in Gloucester's inventory was superior to Evergreen's reclamation rights. *See id.* at 297. As Evergreen's brief on appeal is expressly limited to its conversion claim, its other claims are deemed waived. *See Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 970 n. 4 (1st Cir.1993) (claims not raised on appeal are deemed abandoned); *Sheinkopf v. Stone*, 927 F.2d 1259, 1263 (1st Cir.1991) (similar).

## II

### *GOVERNING LAW*

As an initial matter, Evergreen asserts that its conversion claim was subject to the district court's admiralty jurisdiction. Al-
though the Banks do not challenge diversity jurisdiction, *see* 806 F.Supp. at 295, they contest admiralty jurisdiction, apparently to avoid the application of maritime law. *See, e.g., Austin v. Unarco Inds., Inc.*, 705 F.2d 1, 6 n. 1 (1st Cir.), *cert. dismissed*, 463 U.S. 1247, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983) ("once admiralty jurisdiction is established, then all of the substantive rules and precepts peculiar to the law of the sea become applicable") (quoting *Brance v. Shumann*, 445 F.2d 175, 178 (5th Cir.1971)). The parties have identified no material difference between maritime law and Massachusetts law governing these conversion claims. *Compare Goodpasture, Inc. v. M/V Pollux*, 602 F.2d 84, 87 (5th Cir.1979), *cert. denied*, 460 U.S. 1084, 103 S.Ct. 1775, 76 L.Ed.2d 347 (1983) (identifying elements of conversion claim in admiralty), *with, e.g.*, Joseph R. Nolan & Laurie J. Santorio, 37 *Massachusetts Practice: Tort Law*, § 55 (2d ed. 1989), at 65 (identifying elements of conversion claim under Massachusetts law). Assuming differences exist, however, *see Furness Withy (Chartering), Inc. v. World Energy Sys. Assoc.*, 854 F.2d 410, 412 (11th Cir.1988), *cert. denied*, 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 186 (1989), we agree with the district court that Massachusetts law governs Evergreen's claim.

■ The admiralty jurisdiction test for tort claims is "clearly established." *Shea v. Rev–Lyn Contracting Co.*, 868 F.2d 515, 517 (1st Cir.1989). It comprises two functional inquiries: first, the traditional "situs" analysis determines whether the tort was committed or the alleged injury occurred on navigable waters, *see id.* (citing *The Plymouth*, 70 U.S. (3 Wall.) 20, 33, 18 L.Ed. 125 (1866)); and, second, the more recently developed "nexus" analysis determines whether the alleged tort bears a significant relationship to traditional maritime activities. *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 102

---

3. Lekkerkerk is identified as "Lekkerkerk" in the Banks' brief, and as "Lekkerrerk" in Gloucester's complaint and the district court opinion. *See* 806 F.Supp. at 293. The Banks assert, without contradiction, that "although [Lekkerkerk] has a somewhat similar name, [it] is an entirely different bank" from defendant-appellee Cooperative Centrale Raiffeisen–Boerenleen Bank.

4. Evergreen's amended complaint included counts (1) against Gloucester, for misrepresentation and breach of contract; (2) against the scallops, *in rem*, under Supplemental Admiralty Rule D; and (3) against the Banks, for conversion and replevin. A default judgment was entered against Gloucester on December 10, 1992, for failure to defend the action.

S.Ct. 2654, 73 L.Ed.2d 300 (1982); *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). The "situs" and "nexus" requirements must both be met before admiralty jurisdiction can attach. *See, e.g., Shea,* 868 F.2d at 517 (noting dual nature of test); *Carey v. Bahama Cruise Lines,* 864 F.2d 201, 207 n. 4 (1st Cir.1988) (same); *accord, Cochran v. E.I. DuPont de Nemours & Co.,* 933 F.2d 1533, 1537 (11th Cir.1991) ("The Court in *Executive Jet* did not replace the traditional locality test, but instead added a second prong, the nexus test"), *cert. denied,* —— U.S. ——, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992).

■ The present conversion claim founders on the "situs" prong of the *Executive Jet* analysis. In the admiralty context, as elsewhere, conversion is simply an intentional and wrongful exercise of dominion or control *over a chattel,* which seriously interferes with the owner's rights in the chattel. *See Goodpasture,* 602 F.2d at 87; *Berry v. Boat Giannina B., Inc.,* 460 F.Supp. 145, 150 (D.Mass.1978); *Restatement (Second) of Torts* § 222A (1965). Admiralty jurisdiction over a conversion claim accordingly depends on whether the chattel was "on navigable waters" at the time of the alleged wrongful exercise of dominion. *See, e.g., Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 808 (2d Cir.1971) (no admiralty jurisdiction over warehouseman whose loss of property, entrusted by ocean carrier, occurred while goods were on land); *cf. Schoening v. Shipment of 102 Jute Bags,* 132 F.Supp. 561, 562 (E.D.Pa.1955) (no admiralty jurisdiction over ocean carrier for shipment of goods converted from onshore warehouse; "the conversion was completed when the goods were removed from the warehouse"); *see generally The Lydia,* 1 F.2d 18, 23 (2d Cir.) *cert. denied,* 266 U.S. 616, 45 S.Ct. 97, 69 L.Ed. 470 (1924) ("conversion is a tort, . . . and if that tort is committed on navigable waters, admiralty has jurisdiction"). In the present case, long before the Banks asserted dominion over the scallops under the terms of their security agreements, Gloucester had removed the scallops to its storage warehouse in Massachusetts, some four hundred miles from the point of Evergreen's disaffreightment in Port Elizabeth, thereby severing any conceivable maritime situs. *Compare Leather's Best,* 451 F.2d at 808.

■ Evergreen bases its assertion of admiralty jurisdiction on the ground that the district court's decision "directly affects the integrity of order bills of lading." Thus, apparently Evergreen would extend the so-called "impact" test for admiralty jurisdiction, applicable to claims for intentional interference with contractual relations, to the present claim for conversion. *See Carroll v. Protection Maritime Ins. Co.,* 512 F.2d 4, 8 (1st Cir.1975) (articulating "impact" test); *see also Pino v. Protection Maritime Ins. Co.,* 599 F.2d 10, 12–13 (1st Cir.) *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) (reaffirming *Carroll* 's "extension of location test"). We agree with the district court that the *Carroll* "impact test" does not apply to the present transaction.

*Carroll* was an action for tortious interference with contractual relationships, brought by various seamen and commercial fishermen, against marine insurers whose "blacklist" of past claimants allegedly interfered with the claimants' efforts to contract for employment on marine vessels. Although it was alleged that the blacklist prevented the claimants, *while on land,* from securing contracts of employment, its purpose and effect was to prevent their *employment aboard seagoing vessels.* 512 F.2d at 6. On these facts, the *Carroll* court concluded, "the critical focus should not be 'where the wrongful act or omission has its inception, but where the impact of the act or omission produces [the] injury,'" *id.* at 8 (citing *O'Connor & Co. v. City of Pascagoula,* 304 F.Supp. 681, 683 (S.D.Miss.1969)). Applying this principle, *Carroll* held that "the impact of defendants' alleged actions, at least where existing employment was terminated, was felt in the operations of the affected vessels at sea," *id.,* and was "so interwoven with present and potential maritime contractual relationships—traditional concerns of admiralty—as to fall within [the admiralty] jurisdiction," *id.* at 8–9.

Unlike the *Carroll* claim for interference with a *contract,* Evergreen's conversion claim alleges interference with *chattels.* A chattel

has a determinate location; hence the "situs" of the tort of conversion is more readily identified, and does not depend solely on an assessment of its impact upon maritime activities. Furthermore, the relevant purposeful act in the tort of conversion is the *exercise of dominion* over a chattel, which may entail liability even though the defendant initially acted on a good-faith, non-maritime claim of right. *See, e.g., Restatement (Second) of Torts* § 244 (1965) ("actor is not relieved of liability ... for conversion by his belief, because of a mistake of law or fact not induced by the other, that he ... is entitled to ... immediate possession [of the converted chattel]"). In these circumstances, the "maritime nexus," *found "dominant" in Carroll, see* 512 F.2d at 6, is sufficiently attenuated that a *Carroll*-based "impact" analysis would invite "open-ended expansion of admiralty jurisdiction," *id.* Thus, the district court correctly concluded that Evergreen's conversion claim implicated its diversity jurisdiction, rather than admiralty jurisdiction, and that—to the extent differences exist—the conversion claim was governed by Massachusetts law, rather than maritime law.

### III

### DISCUSSION

■■■ A plaintiff asserting a conversion claim under Massachusetts law must show that: (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.[5] *See* 806 F.Supp. at 296–97 (citing *Magaw v. Beals,* 272 Mass. 334, 172 N.E. 347 (1930)); *see also In re Halmar Distributors, Inc.,* 968

F.2d 121, 129 (1st Cir.1992); *MacNeil v. Hazelton,* 306 Mass. 366, 367, 28 N.E.2d 477, 478 (1940). Since the evidence establishes beyond dispute that the Banks asserted dominion over the scallops, and refused Evergreen's demands for their return, *see* 806 F.Supp. at 295–97, the principal issue before us is whether any rights the Banks may have acquired by virtue of their security interests in Gloucester's after-acquired inventory were superior to Evergreen's reclamation rights as bailee of the scallops under the order bills of lading.

■■■ We review summary judgments *de novo,* affirming only if it appears—after considering all competent evidence and reasonable inferences in the light most favorable to the non-moving party—that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See, e.g., Continental Grain Co.,* 972 F.2d at 429–30; *National Expositions, Inc. v. Crowley Maritime Corp.,* 824 F.2d 131, 134 (1st Cir.1987).

### A. *Evergreen's Interest*

■■■ The district court likened Evergreen's interest in the scallops to that of a *seller* of goods, and Gloucester to "an insolvent buyer", *see* 806 F.Supp. at 297; hence the putative "sale," though *voidable,* was not *void* until Evergreen disavowed it and moved to reclaim the goods. *See* Mass.Gen.L. ch. 106 § 2–702(2) ("seller [who] discovers that the buyer has received goods on credit while insolvent ... *may* reclaim the goods *upon demand*") (emphasis added). Under this analysis, since an Article 9 secured party is a "purchaser" of the debtor's interest in the collateral, *see id.* at §§ 1–201(32), 1–201(33); *Burk v. Emmick,* 637 F.2d 1172, 1174 (8th Cir.1980); *In re Samuels & Co.,* 526 F.2d 1238, 1242 (5th Cir.), *cert. denied,* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), Evergreen's failure to disavow the sale prior to the Banks' "purchase" through foreclosure

---

5. Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Since the parties have ignored choice-of-law issues on appeal, we indulge their assumption that Massachusetts would apply its own substantive

law. *See Carey,* 864 F.2d at 206 (given "reasonable relation" between dispute and forum whose law is invoked by parties, court of appeals may "forego independent analysis" of choice-of-law issue); *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 375 (1st Cir.1991) (similar).

subordinated Evergreen's interest to the Banks' security interests in the scallops. *See* Mass.Gen.L. ch. 106, § 2–702(3) ("the seller's right to reclaim ... is subject to the rights of ... [a] good faith purchaser or lien creditor under this Article"); *see also id.* at § 2–403(1) ("A purchaser of goods acquires all title which his transferor had or had power to transfer.... A person with *voidable title* has power to transfer good title to a good faith purchaser for value. Where goods have been delivered under a transaction of purchase the purchaser has such a power even though ... (d) the delivery was procured through fraud") (emphasis added).

The difficulty with the district court's analysis lies in its fundamental premise, *viz.*, that Evergreen, in releasing the scallops to Gloucester pursuant to the letters of guaranty, was a "seller," and Gloucester, in thus acquiring possession, was a "buyer." Rather, we think the transaction was one of "entrustment," *see* Mass.Gen.L. ch. 106, § 2–403(2), (3), whereby neither Gloucester nor the Banks acquired an interest in the scallops superior to Evergreen's limited right to their possession.

Under the Uniform Commercial Code, a "seller" is "a person who sells or contracts to sell goods," *id.* at § 2–103(1)(d), and a "buyer" one "who buys or contracts to buy goods," *id.* at § 2–103(1)(a). A "sale," by definition, "consists in the passing of title from the seller to the buyer for a price (section 2–401)," *id.* at § 2–106(1) (emphasis added), and a "contract for sale" means "a present sale of goods or a contract to sell goods at a future time." *Id.* Accordingly, though U.C.C. § 2–401 does not define "title," noting simply that "each provision of ... Article [2] with regard to the rights, obligations and remedies of the seller, the buyer, purchasers and other third parties applies *irrespective of title* to the goods *except where the provision refers to such ti-*

tle," [6] *id.* at § 2–401 (emphasis added), no "sale" of goods occurs, within the meaning of § 2–106, without a present or future *capacity* on the part of the "seller" to convey *title* to the "buyer." *See generally* William L. Tabac, *The Unbearable Lightness of Title Under the Uniform Commercial Code*, 50 Md. L.Rev. 408 (1991) (noting contradictions in Article Two references to title; concluding that "title under the Code means ownership," and that "title principles are still firmly in place, if not in sight, as the framework for today's commerce in goods"). We return to the present transaction with these principles in mind.

■ It is well settled that an ocean carrier possesses no title or other ownership interest in goods carried under a negotiable bill of lading; title is vested in the holder of the bill of lading, whose interests the carrier represents, under the contract of carriage and maritime law, as "a special type of bailee." *See Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 U.S. 104, 109, 62 S.Ct. 156, 160, 86 L.Ed. 89 (1941); *Schnell v. The Vallescura*, 293 U.S. 296, 303, 55 S.Ct. 194, 195–96, 79 L.Ed. 373 (1934); *C–ART, Ltd. v. Hong Kong Islands Line America, S.A.*, 940 F.2d 530, 533 n. 2 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1762, 118 L.Ed.2d 425 (1992); *see also Baker Oil Tools, Inc. v. Delta S.S. Lines, Inc.*, 562 F.2d 938 (5th Cir.1977) (bailment relationship under contract of carriage continues before and after termination of voyage); *cf.* U.C.C. § 2–705(1) (referring to "goods in possession of a carrier or other bailee"). Thus, absent extraordinary circumstances, such as rapid deterioration of the cargo, *see T.J. Stevenson & Co. v. 81,193 Bags of Flour*, 449 F.Supp. 84, 123 (S.D.Ala.1976), *aff'd. in pertinent part*, 629 F.2d 338, 383 (5th Cir.1980), the carrier has neither actual nor apparent authority to "sell" the goods it carries.[7] The carrier's

---

**6.** *See, e.g.*, Mass.Gen.L. ch. 106, § 2–403(1), (2), (3).

**7.** Indeed, the summary judgment record in the present case indisputably demonstrates that there can have been no "contract," within the meaning of Article 2: "In this Article unless the context otherwise requires 'contract' and 'agreement' are limited to those relating to the present

or future sale of goods." Mass.Gen.L. ch. 106, § 2–106(1). Moreover, not only does a future sale of goods require a contract of sale, *id.*, but a "'present sale' means a sale which is accomplished by the making of the *contract*," *id.* (emphasis added). Since the express terms of the letters of guaranty flatly belie Evergreen's *capacity* to effect either a present or future sale of scallops in which Gloucester already purportedly

sole legitimate interest is its limited right to *possess* the goods, pending presentment of the bills of lading; and its temporary release of possession, pending a consignee's promised production of the bills of lading, is not a "sale" but an *entrustment. See* Mass.Gen.L. ch. 106, § 2–403(3) (" 'Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.").[8]

▪ On similar analysis, although "purchase" is defined more broadly than "sale," without reliance on "title" principles, *see id.* § 1–201(32) (" 'purchase' includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property"), under a "transaction of purchase" a "purchaser of goods acquires [only the] title which his *transferor had or had power* to transfer ... [and] a purchaser of a limited interest acquires rights only to the extent of the interest purchased," *id.* § 2–402(1). Thus, a person who knowingly obtains goods—subject to an outstanding negotiable bill of lading—from an ocean carrier with a mere possessory interest in the goods, ordinarily "purchases" no "title" (even voidable title) in the goods. *See generally, e.g., Kimberly & European Diamonds, Inc. v. Burbank,* 684 F.2d 363, 366 (6th Cir.1982) (bailee "had no title, nor did she have authority to pass title," and putative purchaser from bail-

ee "acquired no interest" in bailed property); *In re Sitkin Smelting & Refining Inc.,* 639 F.2d 1213, 1215–17 (5th Cir.1981) (similar); Robert A. Hillman *et al., Common Law and Equity Under the Uniform Commercial Code* (1985 & Supp.1991), at ¶ 18.03[2] (collecting cases).[9]

▪ Finally, on similar reasoning, we cannot credit the Banks' reliance on the Uniform Commercial Code provisions governing "consignment sales":

Where goods are *delivered to a person for sale* and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then *with respect to claims of creditors of the person conducting the business the goods are deemed to be on sale or return.* The provisions of this subsection are applicable even though an agreement purports to reserve title to the person making delivery until payment or resale or uses such words as 'on consignment' or 'on memorandum.'

Mass.Gen.L. ch. 106, § 2–326(3) (emphasis added). Thus, even assuming that Gloucester "dealt in goods" like these (which cannot be conclusively determined from the appellate record), the scallops were not subject to the claims of Evergreen's creditors unless delivered "for sale" or "for resale," *id.* § 2–326. As both parties well recognize, Evergreen lacked both the intent and the legal capacity to empower Gloucester either to re-sell, *see id.* at § 2–326(1)(b), or to sell, *see id.* at § 2–326(3), these scallops so long as title remained exclusively in the holder of the negotiable bills of lading.[10] Thus, we join

---

held title by virtue of its claim to the negotiable bills of lading in transit, there could be no contract or agreement of sale of any kind between Evergreen and Gloucester. *See also id.* § 1–201(3), (11).

**8.** The Banks do not benefit from U.C.C. § 2–403(2), which provides that "any entrusting of goods to a merchant who deals in goods of that kind gives [the merchant] power to transfer all rights of the entruster to a buyer in the ordinary course of business." It is well settled that U.C.C. § 2–403(2) protects only "persons who buy in the ordinary course out of inventory." *See* U.C.C. § 2–403(2) cmt. 3. The holder of a security interest in a merchant's inventory is not "a buyer in the ordinary course" of goods entrusted to the

merchant's possession as a result of the merchant's fraud. *See* U.C.C. § 1–201(9) (defining "buyer in the ordinary course of business" as excluding a "transfer ... as security for ... a money debt"); *see also, e.g., Sitkin Smelting,* 639 F.2d at 1213; Robert A. Hillman *et al., Common Law and Equity Under the Uniform Commercial Code* (1985 & Supp.1991), at ¶ 18.03[2][b].

**9.** Of course, restrictions on a "seller's" reclamation rights, *see, e.g.,* Mass.Gen.L. ch. 106 §§ 2–507, 2–702(3), are inapplicable for the same reason.

**10.** The letters of guaranty are not phrased in terms of a delivery for sale or resale, but of an entrustment of possession pending Gloucester's

those courts which have held that temporary entrustments of possession by a bailee, without more, are not "sales on consignment," within the meaning of U.C.C. § 2–326. *See Sitkin Smelting*, 639 F.2d at 1218 (delivery of waste film, for processing and extraction, not a "delivery for sale" under U.C.C. § 2–326); *cf. e.g., In re Zwagerman*, 115 B.R. 540 (Bankr.W.D.Mich.1990) (delivery of cattle, for "feeding," not a "delivery for sale"), *aff'd*, 125 B.R. 486 (W.D.Mich.1991); *In re Key Book Service, Inc.*, 103 B.R. 39 (Bankr. D.Conn.1989) (delivery of books, merely for shipping, billing, warehousing, not a "delivery for sale"); *see generally* Hillman, *supra*, at ¶ 18.03–[2][c] & n. 126 (discussing meaning of "delivery for sale").

Finally, under Mass.Gen.L. ch. 106, § 9–203(1)(c), "[a] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless ... the *debtor has rights in the collateral.*" (Emphasis added.) Although the term "rights in the collateral" is not defined in the Code, and has been viewed broadly by courts on occasion, *see, e.g., Kinetecs Technology Int'l Corp. v. Fourth Nat'l Bank*, 705 F.2d 396 (10th Cir.1983) ("the Code clearly does not require that a debtor have full ownership rights"), it clearly contemplates some *property interest* in goods, not mere bare possession acquired from a bailee under a transaction of entrustment. *Sitkin Smelting*, 639 F.2d at 1217–18; *Northwestern Bank v. First Virginia Bank*, 585 F.Supp. 425, 428–29 (W.D.Va.1984) ("Mere possession by the debtor is insufficient to establish a right in the collateral upon which to base a security interest.... The debtor must acquire some ownership interest in the collateral before a valid security interest arises"); *see generally* James J. White & Robert S. Summers, *Uniform Commercial Code* § 23–5 (3d ed. 1988), at 263 ("if the transaction

[endowing debtor with possession] were merely a bailment ... the law would be clear: the bailed goods would be returned to the owner"); Hillman, *supra*, at ¶ 18.03[1]. Since mere possession of goods under a transaction of entrustment clothes a debtor with no "rights in the collateral" to which a security interest can attach, within the meaning of Mass.Gen.L. ch. 106, § 9–203(1)(c), the Banks acquired no enforceable lien in the scallops by virtue of their security interests in Gloucester's after-acquired inventory.[11]

## IV

### CONCLUSION

Evergreen was not a "seller," Gloucester was not a "buyer," and the temporary entrustment of possession of the scallops to Gloucester was neither a "sale" nor a delivery for sale or resale. Thus, as a bailee, Evergreen retained reclamation rights to the scallops under a common law claim for conversion. *See Restatement (Second) of Torts*, § 225 & cmt. b; *see also id.* at § 222A, illustr. 9. As the Banks' Article 9 security interests in Gloucester's after-acquired inventory did not attach to the entrusted scallops, Evergreen retained a possessory claim sufficient to overcome the Banks' motion for summary judgment.[12]

*The district court judgment is vacated and the case is remanded for further proceedings consistent herewith; each party to bear its own costs on appeal.*

---

presentment of the order bills of lading. *See supra* note 2. Thus, the letters of guaranty evince (1) Gloucester's acknowledgement that title to the scallops was in the holder of the order bills of lading, not Evergreen, and (2) Gloucester's representation that it was the holder of the bills.

11. As Dutch Bank is not a party to these proceedings, we take no position on any potential

claim it may have for Evergreen's entrustment of possession of the scallops to Gloucester without first taking up possession of the bills of lading. *But see supra* n. 1.

12. Evergreen filed no cross-motion for summary judgment, however. Accordingly, the case must be remanded to the district court for such further proceedings as are consistent with this opinion.