# United States Court of Appeals
## For the First Circuit

Nos. 15-2423, 15-2438

TIMOTHY A. DENAULT; JENNIFER TESTA,

Plaintiffs, Appellants/Cross-Appellees,

v.

TODD AHERN, individually and in his official capacity;
CRAIG WALSH, individually and in his official capacity;
TOWN OF CHELMSFORD, Commonwealth of Massachusetts,

Defendants/Third Party Plaintiffs, Appellees/Cross-Appellants,

OTHER POLICE OFFICERS PRESENTLY UNKNOWN,

Defendants,

v.

CHRISTOPHER'S EMERGENCY EQUIPMENT AND TOWING, INC., f/d/b/a
Christopher's Towing Service,

Third Party Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,[*]
and Selya, Circuit Judge.

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Andrew M. Fischer, with whom Law Offices of Jeffrey S. Glassman LLC was on brief, for appellants/cross-appellees.

Jeremy Silverfine, with whom Deidre Brennan Regan and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellees/cross-appellants.

---

May 16, 2017

---

**KAYATTA**, **Circuit Judge**. Chelmsford, Massachusetts police officers seized Timothy Denault's car to search it for evidence, to no avail. Denault nevertheless ended up losing the car, and his ex-girlfriend's possessions in the car, because accumulated towing and storage fees owed to the city's towing vendor exceeded the value of the seized property. Denault and his ex-girlfriend, Jennifer Testa, sued, blaming the loss on the police officers' failure to return the car promptly upon completing the search. A series of rulings before and after trial eliminated all federal and state civil rights claims, including the potential for shifting attorneys' fees in favor of the prevailing party. Left standing at the end was a judgment on a common law conversion claim against one officer, Todd Ahern, in favor of Denault and Testa in the amounts of $2200 and $25, respectively. Denault and Testa appeal in an effort to revive a civil rights claim that might serve as a basis for an award of attorneys' fees. Ahern, in turn, asks us to reverse or vacate the judgment against him on the common law conversion claim. For the following reasons, and on an admittedly confusing record, we leave matters as they now stand.

## I.

With the plaintiffs arguing that the district court erred in dismissing some claims as a matter of law, and with the defendants arguing that the district court should have dismissed all claims, we review the evidence presented at trial and the

inferences supported by that evidence in the light most favorable to the plaintiffs.  See White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000).  This means, among other things, that where the testimony at trial was conflicting, we must assume that the jurors believed the plaintiffs' version unless it was unreasonable to do so.

**A.**

On October 21, 2013, officers of the Chelmsford Police Department ("CPD") located a 2000 Nissan Maxima parked in the driveway of a Lowell, Massachusetts home.  The car belonged to Denault, the suspect in a crime they were investigating.  The home belonged to Testa, Denault's ex-girlfriend and the mother of his three children.

The officers, including Ahern and Craig Walsh, encountered Testa at her home.  They tried to question her about Denault, who was then in custody.  During the exchange, Testa confirmed that she had possession of Denault's car, the Nissan Maxima.  The officers told Testa that they needed to take the car and asked her for the keys.  Testa responded that she was running late for a meeting and did not have time to find the keys.

After Testa drove away in a different car, the officers had Denault's car towed to the stationhouse by Christopher's Towing.  They impounded the car and secured a warrant to search it.  Two days after seizing the car, they executed the warrant

with assistance from state forensic scientists. The forensic scientists examined the car for evidence and inventoried its contents, which included one booster seat. A few days later, when the officers determined that the car did not contain evidence pertinent to their investigation, they released it to Christopher's Towing. CPD officers had no contact with Denault, the registered owner of the car, about either the seizure or the release. When CPD released the car to Christopher's Towing, CPD officers did not supply, and Christopher's Towing did not request, contact information for Denault, who had been in custody since before the car was towed. Accordingly, Christopher's Towing sent no notice to Denault at the time, and Denault was unaware that CPD had released his car to Christopher's Towing.

Starting on the date the car was towed, and repeatedly thereafter, Testa tried to recover the car and her belongings inside it. She was especially keen to retrieve two children's booster seats she claimed she had left in the rear of the car.[1] According to Testa, the CPD officers with whom she spoke refused to discuss returning the car or its contents unless Testa agreed to be questioned in connection with the criminal investigation into Denault. Because Testa "didn't have anything that [she] could tell [the officers] about what happened to [Denault]," she never

_____

[1] The number of booster seats is an issue that the parties no longer contest as material.

went to the stationhouse and eventually stopped calling CPD. When Testa was subpoenaed in connection with the criminal investigation several weeks later in November 2013, she reminded the CPD officers that she still needed her belongings. The officers responded that they had not returned her property because she had declined to speak with them about Denault. The officers never returned Testa's property, and--according to Testa--they never informed her that they had released the car to Christopher's Towing.

Testa learned that Christopher's Towing had possession of the car over three months later, when Denault's mother showed her a Notice of Abandoned Vehicle sent to Denault's last known address. The notice, dated February 24, 2014, indicated a lien on the car in the amount of $4797.82 for towing fees, storage costs, and processing services. Testa told Denault, who remained incarcerated, about the notice. Neither Testa nor Denault was able to afford the sum listed on the notice. Accordingly, neither paid it.

Instead, on September 23, 2014, Denault and Testa filed this action against the Town of Chelmsford as well as Walsh and Ahern in their individual and official capacities. The operative complaint seeks recovery under 42 U.S.C. § 1983 for violations of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution (count I) as well as the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I (count II). It further alleges

- 6 -

a common law claim that the defendants converted the plaintiffs' property (count III).  The complaint also asserts municipal liability (count VI) with respect to the alleged federal constitutional violations as well as conspiracy (count IV) and aiding and abetting (count V).  The complaint seeks compensatory and punitive damages and attorneys' fees.

**B.**

After the district court denied the defendants' motion to dismiss the complaint, the defendants answered and filed a third-party complaint against Christopher's Towing.  The district court ordered the original parties to proceed to trial in June 2015 and scheduled the third-party trial to follow in January 2016. In advance of the first trial, the defendants moved for summary judgment and the plaintiffs cross-moved for partial summary judgment.  The district court denied the plaintiffs' motion and granted the defendants' motion in part, dismissing claims related to the initial seizure of the car because the seizure "was lawful under the automobile exception to the Fourth Amendment, or if not, the officers enjoy qualified immunity."  During the ensuing trial, the district court granted a motion for directed verdict dismissing all claims against Walsh and the Town of Chelmsford, leaving Ahern as the only defendant.  The district court also granted a second motion for directed verdict as to all "substantive and due process claims."  The jury ultimately returned a verdict sheet stating

only that "[w]e find for" the plaintiffs, in the amounts of $2200 and $25.

The plaintiffs promptly moved for entry of judgment on the verdict. The district court granted that motion, entering judgment for the plaintiffs on counts I and III of the operative complaint, i.e., a federal constitutional claim and a state law conversion claim for each plaintiff. The plaintiffs then moved for attorneys' fees under 42 U.S.C. § 1988(b) based on their having prevailed on a federal constitutional claim actionable under 42 U.S.C. § 1983. The defendants opposed that motion and filed a motion for judgment notwithstanding the verdict, or to alter and amend the judgment, or for a new trial.

The district court denied the defendants' tripartite motion "save that the judgment shall be amended to reflect that the jury verdict entered solely on the conversion count," which was count III of the operative complaint. Having thus excised count I (the federal claims), the court denied the plaintiffs' motion for attorneys' fees because the remaining common law conversion claim furnished no basis for an award of fees under 42 U.S.C. § 1988(b). The district court also entered a separate judgment on the adjudicated claims under Federal Rule of Civil Procedure 54(b) to facilitate an immediate appeal without waiting for trial of the third-party claims.

These timely appeals followed. During their pendency, a stipulation of dismissal resolved the third-party complaint against Christopher's Towing.

**II.**

**A.**

We begin by defining the scope of the plaintiffs' appeal. A notice of appeal need "designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). In a civil case resulting in a final judgment, there are two ways to make this designation. One is to list in the notice each "judgment, order or part thereof" of which review is sought. This approach, although in strict compliance with the rule, is perilous. When later preparing the brief and reviewing the record, including transcripts that may not have been available when the notice of appeal was due, counsel may perceive a need or opportunity to raise a challenge that was not apparent at the time of appeal. But if we should find it clear that the object of that challenge was not presciently included in the itemized list of rulings appealed, we will have no jurisdiction to consider the challenge. Santos-Santos v. Torres-Centeno, 842 F.3d 163, 169 (1st Cir. 2016).

The safer course is to take advantage of the fact that all interlocutory rulings in a case "merge in the judgment." John's Insulation, Inc. v. L. Addison & Assocs., Inc., 156 F.3d 101, 105 (1st Cir. 1998). Therefore, "it has been uniformly held

- 9 -

that a notice of appeal that designates the final judgment encompasses not only that judgment, but also all earlier interlocutory orders." Id.

The plaintiffs opted for the riskier itemized designation, from which they omitted any challenge to the district court's summary judgment on their claims challenging the initial seizure of Denault's car. This was likely not inadvertence, as the plaintiffs' subsequent designation of the contents of the appendix also excluded materials relevant to that ruling. By the time counsel briefed the appeal, though, he apparently deemed it worthwhile to include a challenge to that ruling. The defendants objected, asserting waiver and thus lack of jurisdiction. The plaintiffs' reply offered no rejoinder. And the law, as we noted, is clear that where a notice of appeal designates only specific interlocutory orders or parts thereof, it does not provide us with jurisdiction to review others. So we eschew consideration of any argument that the plaintiffs should be entitled to relief from the defendants on account of the initial seizure of the car.

**B.**

What the plaintiffs did clearly appeal was the manner in which the district court treated the jury verdict in first entering judgment for the plaintiffs on some unspecified federal constitutional claims (count I) as well as the state law conversion claims (count III) and then later amending the judgment to strike

count I. The trouble began when the district court ruled on various motions for judgment as a matter of law during the trial. The court never explained exactly what claims it was leaving in and what claims it was throwing out. Adding to this confusion, in its cryptic references to the claims still extant, the district court seemed to use the term "conversion" to describe both counts. The jury verdict form itself added no clarity. It simply asked the jury to check the names of the parties "[w]e find for," and then to indicate the amount of any damages if the jury found for either plaintiff.

Several strong hints support the plaintiffs' contention that the district court did in fact submit some claim of a federal constitutional violation to the jury. In addressing the second motion for directed verdict, the district court stated that the motion was "allowed in part as to the substantive and due process claims and denied in part as to the constitutional violation because of the alleged conversion." The jury instructions themselves repeatedly referred to the United States Constitution and the Bill of Rights. The district court expressly covered the need to determine that a defendant acted under color of law, an element of the federal constitutional claim as actionable under 42 U.S.C. § 1983. Adickes v. S. H. Kress & Co., 398 U.S. 144, 150 & n.4 (1970). All of this aligns with the fact that when the district court first entered judgment, it expressly did so as to count I as

well as count III.  And when, over the plaintiffs' objection, it later reversed course by amending the judgment to apply only to count III, the district court provided no useful explanation.

Ultimately, we need not decide which claims the district court intended to present to the jurors.  If count I did not go to the jury, it was only because the district court did, as the defendants claim, grant a directed verdict on the entire count.  Alternatively, if count I did go to the jury (as seems most likely), then amending the judgment was nonetheless proper if the count should not have gone to the jury.  In such circumstances, the amendment would stand either as a correction of a "manifest error[] of law," 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (3d ed. 2017), or as harmless error.  In short, if there was no evidence sufficient to support a finding for the plaintiffs under count I, then the judgment as amended reads just as it should read.  And if there was such evidence, then the plaintiffs' challenge to the amendment of the judgment should prevail, leaving only the matter of relief.  So we turn to the pivotal question:  Did the evidence support a verdict on count I for the plaintiffs?

To answer that question, we begin by determining what constitutional claim the plaintiffs would have us find in count I.  Their opening brief on appeal advances federal constitutional claims related to the car's initial seizure and to its subsequent

retention and transfer. As we have explained, one point upon which this record is clear is that any claim based on the initial seizure was rejected on summary judgment, and we lack jurisdiction to review that ruling under the narrow notice of appeal the plaintiffs filed. So we consider only the argument that the retention of the seized property, and its transfer to the tow company, violated the United States Constitution.

While the complaint invoked a myriad of constitutional theories, the plaintiffs on appeal ground their federal claim solely in the Fourth Amendment's protection against unreasonable seizures as applied against the states through the Fourteenth Amendment. Yet the only authority they have cited in their briefs or at oral argument is an out-of-circuit case that contains no discussion of the Fourth Amendment's restraints on seizures. See Reitz v. County of Bucks, 125 F.3d 139 (3d Cir. 1997). Rather, Reitz determined that "claims based on detention of the property following [a state court order mandating the property's return] are distinct from those relating to the seizure [of the property]." Id. at 144.

At least three of our sister circuits have expressly rejected Fourth Amendment claims based on a failure to return property after it was lawfully obtained. See Shaul v. Cherry Valley-Springfield Cent. Sch. Dist., 363 F.3d 177, 187 (2d Cir. 2004); Lee v. City of Chicago, 330 F.3d 456, 466 (7th Cir. 2003);

- 13 -

Fox v. Van Oosterum, 176 F.3d 342, 351 (6th Cir. 1999). They have reached that conclusion in different ways. The Sixth Circuit focused on the definition of "seizure," finding that the term has temporal bounds such that it protects only the interest in retaining property and not the interest in regaining it. Fox, 176 F.3d at 349-52.[2] The Seventh Circuit held that applying the Fourth Amendment in these circumstances stretches its protections too far beyond the amendment's purpose of constraining unlawful intrusions into constitutionally protected areas. Lee, 330 F.3d at 465-66. And the Second Circuit rejected the seizure-includes-retention theory out of hand, writing that "[t]o the extent the Constitution affords [a plaintiff] any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process." Shaul, 363 F.3d at 187. The plaintiffs make no effort to address these authorities or explain why the alleged violation of their constitutional rights sounds in the Fourth Amendment.

On such a record, we are offered no reason to disagree with our sister circuits that, to the extent a plaintiff may

_____

[2] That court presciently noted that the term may "ha[ve] a different temporal scope when a person rather than property is at issue." Fox, 176 F.3d at 351. The Supreme Court recently endorsed the theory of continuing seizure of persons. See Manuel v. City of Joliet, 137 S. Ct. 911, 919 (2017) (upholding Fourth Amendment claim where plaintiff was detained for some seven weeks after court found probable cause, based on fabricated evidence, for criminal charge).

- 14 -

challenge on federal constitutional grounds the government's retention of personal property after a lawful initial seizure in circumstances such as these, that challenge sounds in the Fifth Amendment rather than in the Fourth Amendment. A different result may well obtain when the government seizes a person rather than property. See Manuel v. City of Joliet, 137 S. Ct. 911, 919 (2017). But where property is concerned, it would seem that the Fifth Amendment's express protections for property provide the appropriate framework. In particular, the Takings Clause provides recourse where "private property [is] taken for public use, without just compensation." U.S. Const. amend. V.

In different circumstances, we might well find that a plaintiff's claims do not necessarily fail merely because the plaintiff wrote "Fourth" rather than "Fifth" in his or her briefs. Here, though, substance followed form, as these plaintiffs never provided the evidence that would be required to support a claim that the defendants violated the Fifth Amendment. Most notably, the plaintiffs do not even claim, let alone prove, that they first sought compensation through state procedures or that "all potential state remedies are 'unavailable or inadequate,'" as required to bring a ripe takings claim in federal court. Deniz v. Municipality of Guaynabo, 285 F.3d 142, 146 (1st Cir. 2002) (quoting Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194, 196-97 (1985)).

- 15 -

We therefore find that the evidence did not support a verdict in favor of the plaintiffs on their preserved federal constitutional claims.  Accordingly, the district court's ultimate disposition of the plaintiffs' federal constitutional claims based on the retention and transfer of the plaintiffs' property was correct.[3]

### III.

In a cross-appeal, Ahern challenges the jury's verdict as to the state law conversion claims on three grounds.  He argues that the jury's verdict lacked a sufficient evidentiary basis, that the district court erroneously excluded evidence favorable to the defendants, and that the district court improperly charged the jury as to the elements of conversion and the calculation of damages.

---

[3] This conclusion rejecting the plaintiffs' challenge to the dismissal of their federal constitutional claims renders moot their argument on appeal that they should be awarded attorneys' fees under 42 U.S.C. § 1988(b) for having prevailed on such claims. It likewise resolves their appeal related to their municipal liability claims, which require a predicate federal constitutional violation.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-92 (1978).  Additionally, to the extent the plaintiffs challenge the entry of a directed verdict as to Walsh, that argument is waived due to the lack of any developed legal analysis in the plaintiffs' submissions on appeal.  See Marek v. Rhode Island, 702 F.3d 650, 655 (1st Cir. 2012) (citing United States v. Zannino, 895 F.3d 1, 17 (1st Cir. 1990)).

Ahern's challenge to the sufficiency of the evidence rests on the principle that when property belonging to another is lawfully acquired in the first instance, under a good-faith claim of right, the acquirer's continued retention of the property is not wrongful in the absence of a demand by the owner that the property be returned.  See Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993). We therefore turn our attention to the evidence to see if such a demand was made, keeping in mind that we "examine the evidence and inferences therefrom in the light most favorable to the plaintiff[s]" and "reverse only if a reasonable person could not have reached the conclusion of the jury." White, 221 F.3d at 259.

Walsh testified that he had at least two conversations with Testa in the days following the initial seizure. According to Walsh, Testa wanted to retrieve the car and the booster seat. During their first conversation, Walsh told Testa that he was unable to remove items from the car while he was seeking a warrant to search it.  In a later conversation within days of the first, he "advised her that when [the police] were complete with the investigation of the vehicle, the car would be brought back to Christopher's Towing."  Both Walsh and Ahern said that it was standard operating procedure to release a towed car to the tow company.  The next month, when Walsh and Ahern spoke with Testa at

the Middlesex District Attorney's Office, Testa told them that she still had not retrieved the car because "the tow company told her she needed some type of letter . . . authorizing her to pick up the vehicle."

Testa told the jury a different story. According to her testimony, she contacted CPD repeatedly to request the return of the car and her property inside it. Testa described at least three separate conversations in the days after the car was seized. During each conversation, she was told that the car was not yet ready for pickup. As to the booster seats (she claimed there were two), she testified that a detective told her, "Well, if you come down here and talk with us, maybe we can work something out." Testa understood that the detective was conditioning his return of the property on her cooperation in the investigation regarding Denault.[4] Per Testa's account, no one ever told her that the car could not be released to her and would instead be released to Christopher's Towing. Even when she spoke with the defendants in November, she testified, "they never told [her] that it was at

_____

[4] Construing the evidence in the light most favorable to Testa, this conversation occurred after her October 22 conversation with a CPD representative, which was recorded and played to the jury during trial. On the recorded call, the representative informed Testa that the car was not yet ready for pickup but asked, "Did you want to come and pick up the car seat?" Testa declined, explaining that she would "wait 'til a little later." When Testa called back, however, the detective, according to Testa, was unwilling to return the car seat without receiving her cooperation in return.

- 18 -

Christopher's."  Instead, they faulted her for failing to cooperate in their investigation.

Although these accounts share little in common, two key facts are undisputed.  First, it was clear to the defendants that Testa sought return of Denault's car as soon as it became available for pickup.  Second, the defendants never contested that the plaintiffs retained a possessory interest in the car and its contents, or that they were entitled to retrieve them.  Furthermore, there is ample evidence to find that Testa was acting as Denault's agent.  The defendants argued as much below, referring to Testa as Denault's "authorized agent."  They testified that they observed her driving Denault's car, they took it from her driveway, and they communicated with her about its status.  The defendants presented no testimony that anyone at CPD questioned Testa's authority to retrieve the car.[5]  As to the remaining facts, our standard of review requires us to credit Testa's version, and correspondingly to discredit testimony that Testa knew the car

---

[5] Inexplicably, the plaintiffs state in their response and reply brief that "the car did not belong to [Testa] and she was not the agent of Plaintiff Denault."  This stray and unsupported remark is contradicted by the testimony of both plaintiffs that Testa acted as Denault's agent in her efforts to retrieve the car.  It is also inconsistent with counsel's position at oral argument that CPD should have released the car to Testa as "she was there asking for it."  In any event, the defendants say nothing about this remark in their reply brief, instead acknowledging that "Testa did speak with police officers" about retrieving the property but faulting her for failing to "follow through."

would be released to Christopher's Towing and communicated with Christopher's Towing about the car.

On this record, reasonable jurors could certainly find that both Denault (through Testa) and Testa made clear to the officers that they wanted their property back. Ahern is therefore reduced to arguing that the actual demands were made at a time when the police were entitled to retain the car, and not repeated until after the police turned the car over to the tow company. The relevant point, though, is that the plaintiffs made clear to the police that they wanted their property back, and the police thereafter did not make it promptly available to them, even conditionally, after the police were done with it. We see no reason why Massachusetts law would require that the plaintiffs keep repeating their demands.

This is not to say that the police were required to comply with the demands immediately. The perceived evidentiary value of the car, and the warrant that the officers secured to search it, afforded them a privilege to make a qualified refusal. See Restatement (Second) of Torts § 238 (Am. Law Inst. 1965) ("One in the possession of a chattel does not become a converter by making a qualified refusal immediately to surrender the chattel when the circumstances are such that the demand for immediate surrender is unreasonable."). The problem for Ahern is that he did not surrender the car in accordance with the demand once the

search was completed.  Ahern does have a reason for this failure: city procedure--and an obligation of the car owner to pay the towing cost--required him to turn the car over to the tow company, which was supposed to contact Denault promptly.  In short, Ahern claims an additional and successive basis for making a qualified refusal to return the property.  Assuming that the jury believed Testa, however, it could have found that Ahern never told Testa (or Denault) that the police also had a reason not to return the car even when the search was completed.  And failure to communicate that reason precludes Ahern from relying on it to avoid liability for declining to return the car.  Id. § 241 ("Qualification of a refusal to surrender a chattel to one entitled to immediate possession does not avoid liability for conversion unless . . . such reason is communicated to the claimant at the time . . . .");  Dan B. Dobbs et al., The Law of Torts § 67 (2d ed. 2016).

We likewise sustain the conversion claim as to the booster seats.  There is no dispute that Testa demanded the return of her booster seats.  According to Ahern, however, the defendants never refused her demand; instead, they "told her she could retrieve the car seat if she came into the station."  But Testa said that there were strings attached:  the defendants refused to return the seats unless she agreed to help with their investigation regarding Denault.  The defendants had no privilege to qualify their refusal on that basis and require a quid pro quo.  The

evidence, viewed in Testa's favor, therefore supports a verdict for Testa on this conversion claim.

**B.**

Ahern next argues that the district court incorrectly excluded evidence demonstrating "that notice was given prior to the letter for storage fees in February 2014" and "that the Plaintiffs were offered the car for free and still refused to pick the car up from Christopher's."  "In reviewing an allegation of evidentiary error, we must consider first whether the district court erred and then whether this error was harmful."  Soto-Lebrón v. Fed. Express Corp., 538 F.3d 45, 65 (1st Cir. 2008).  Ahern makes this task difficult by having provided no detailed proffer of the excluded evidence.  As best the record reveals, Ahern seems to refer to evidence that (1) the defendants told Testa about the transfer of the car to Christopher's Towing in October 2013, months before the February 2014 notice; and (2) the owner of Christopher's Towing contacted plaintiffs' counsel to discuss terms for return of the car.

With respect to the former evidence, Ahern misconstrues the district court's ruling.  The district court, during a sidebar right before opening statements, heard general descriptions from each party of expected testimony regarding the conversion of the car.  The court did not exclude any evidence that the defendants proposed to introduce.  Instead, the court accurately identified

the key factual dispute as whether the defendants notified Testa by telephone in October 2013 about transferring the car to Christopher's Towing.  The district court said that it would "get the different positions" from the parties about any pertinent communications in that timeframe and then "explain the legal significance" of those positions to the jury.  During the trial, when Walsh offered the testimony at issue, there was no objection or exclusion.  He told the jury that he informed Testa, within days of the car's seizure, that the car would be transferred to Christopher's Towing.  We therefore discern no exclusion of evidence and no error.

With respect to the proposed testimony by the owner of Christopher's Towing, the district court acted within its discretion to exclude communications between the third-party defendant and plaintiffs' counsel that were reasonably viewed as settlement negotiations.  See Fed. R. Evid. 408(a)(1).  We thus find no error, much less error that harmed Ahern.

## c.

The only remaining arguments relate to the jury charge. Ahern contends that the district court did not properly instruct the jury on the elements of conversion or on damages.  As to the instruction on conversion, he argues that the district court's charge mischaracterized some elements of the claim and omitted others.  Although counsel for defendants complained to the district

court that its instructions omitted the element of demand and refusal, counsel never objected that the instructions also mischaracterized the elements that were covered. We therefore review these asserted errors under different standards.

As for the allegedly mischaracterized elements, because there was no objection, we review only for plain error. See Fed. R. Civ. P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved . . . if the error affects substantial rights."); Estate of Keatinge v. Biddle, 316 F.3d 7, 16 (1st Cir. 2002) ("The party claiming plain error is required to demonstrate '(1) that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that it was sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial proceedings.'" (quoting Gray v. Genlyte Grp., Inc., 289 F.3d 128, 134 (1st Cir. 2002))).

Ahern, citing to Damon v. Hukowicz, 964 F. Supp. 2d 120 (D. Mass. 2013), argues that the instructions mischaracterized the key element of conversion: that "the defendant intentionally and wrongfully exercised control or dominion over the personal property." Id. at 143 (emphasis omitted) (quoting Evergreen Marine Corp., 4 F.3d at 95). Yet the district court instructed the jury that it needed to determine whether Ahern "exercise[d] wrongful dominion over the vehicle" when he transferred it from the stationhouse to the tow company lot. Ahern complains that this

- 24 -

instruction was "woefully deficient," but he does not explain why. We detect no plain error.

As for the preserved objection to the allegedly omitted elements, we generally ask "if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case." Estate of Keatinge, 316 F.3d at 17. Any error we discern, however, "must be evaluated in the context of the entire charge in light of the circumstances of the particular case." 9C Arthur R. Miller, Federal Practice and Procedure § 2558 (3d ed. 2017).

The district court's refusal to include the element of demand and refusal in its instruction on the conversion claim is a puzzler. In denying the defendants' renewed motion for directed verdict, the court acknowledged this element but found that, "drawing all inferences in favor of the plaintiffs, . . . Testa's calls are a sufficient demand." The court did not, however, discuss refusal. The court then provided an overview of its intended jury charge, explaining that "the focus of [its] charge [would] be on whether . . . Ahern sending the vehicle off to the yard was an act of wrongful dominion." The ultimate instruction on the conversion claim said nothing about demand or refusal. After the district court charged the jury, it consulted counsel about any objections. Defense counsel asked the court to instruct

the jury specifically about demand and refusal.  The district court responded, "You've argued that but I've said that was too technical and I am not going to so charge."

Massachusetts law plainly requires proof of demand and refusal when "the defendant legitimately acquired possession of the property under a good-faith claim of right."  Evergreen Marine Corp., 4 F.3d at 95.  Assuming that law applies here, we nevertheless find that the omission of demand and refusal from the jury charge was harmless error.  "[Q]uite often there will be circumstances in the case from which it clearly will appear that the error in the district court's instruction cannot have had any prejudicial effect on the jury's verdict and the error may be treated as harmless."  Miller, supra, § 2558.  The jury's finding on damages shows that this is such a case.

The district court charged the jury on alternative methods of calculating damages--either the value of the car and its contents at the time of the conversion or the cost of regaining possession of the car--and directed the jury to use "the lesser of [the] two different measures."  "We assume the jury listens to and follows the judge's entire charge."  Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 53 (1st Cir. 1998).  In light of that assumption, and the jury's calculation of damages, it is clear that the jury discredited Walsh's testimony that Testa knew when and where to regain possession of the car in October 2013, at which

time Testa could have regained possession for a tiny fraction of the value of the property and of the later bill from Christopher's Towing. That same testimony by Walsh was the only evidence that created a dispute as to whether return of the car was offered or impeded; demand was undisputed by Ahern. Accordingly, we conclude that the district court's failure to instruct the jury on demand and refusal was harmless error. We emphasize that "[o]ur conclusion is not based on any judgment of our own as to what the evidence proved to have happened," Parker v. City of Nashua, 76 F.3d 9, 14 (1st Cir. 1996), but rather is based on what the jury unmistakably found.

Ahern also argues that the district court further erred by botching part of its instructions on how to calculate damages, by suggesting that damages were mandatory, and by charging the jury on punitive damages. Counsel for defendants did not object to these portions of the instructions before or after the district court delivered them. At most, our plain error standard of review applies. See Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 503 (1st Cir. 2011).

As to the instructions on how to calculate damages, Ahern complains that the district court described statutory lien procedures pursuant to which Denault may have owed the tow company. Ahern says that those lien procedures did not apply in this case. Whether that is so we need not decide because Ahern offers no

explanation for how the insertion could have harmed him.  We reject Ahern's argument that the district court framed the instructions so as to compel an award of damages.  The district court specifically cautioned the jury, "don't think that because I charge you on this or that aspect of the case that I think anything has been proved or not proved."  It also acknowledged the possibility that the jury would find "there's no real damage here."  As to punitive damages, Ahern cannot demonstrate an error that affected his substantial rights as the jury declined to award such damages.

Last but not least, Ahern argues that the district court did not inform the parties of its intended instructions before it delivered them.  The district court did generally advise the parties of its intended instructions before closing arguments and before charging the jury, see Fed. R. Civ. P. 51(b)(1), though it did not provide a verbatim copy to the parties in advance.  While we think it prudent for district courts to write and distribute their intended instructions, the law of this circuit does not require judges to follow this common sense approach.  See DeCaro v. Hasbro, Inc., 580 F.3d 55, 65 (1st Cir. 2009).

## IV.

Based on the foregoing, we deny both appeals and affirm the district court's judgment in all respects.  The parties shall bear their own costs.