# United States Court of Appeals
## For the First Circuit

No. 21-1352

JAMPA GONPO, on behalf of himself and others similarly situated,

Plaintiff, Appellee,

v.

SONAM'S STONEWALLS & ART, LLC, d/b/a Sonam's Stonewalls and Art;
SONAM RINCHEN LAMA,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Thompson, Howard, and Gelpí,
Circuit Judges.

Thomas T. Merrigan, with whom Sweeney Merrigan Law, LLP was
on brief, for appellants.
Tiffany Troy, with whom Aaron B. Schweitzer and Troy Law,
PLLC were on brief, for appellee.

July 15, 2022

THOMPSON, **Circuit Judge**.  A Springfield, Massachusetts jury found defendants Sonam Rinchen Lama and Sonam's Stonewalls & Art, LLC (collectively, "Lama"[1]) liable for failing to pay all the wages owed to their former employee, plaintiff Jampa Gonpo. Appealing from the hefty tab the jury left him, Lama trains his focus on two of the district court's evidentiary decisions -- one to exclude, and one to admit evidence -- and asks us to remand for a new trial.  Discerning no reversible error, we affirm.

## BACKGROUND

Gonpo originally hails from Nepal, where he first met Lama (a Tibetan immigrant) in 2004.[2]  While in Nepal on a trip, Lama befriended Gonpo, and three years later, there was an arrangement between the two for Gonpo to move to the United States. There was some dispute at trial over who asked whom to come over, but suffice it to say that Lama fronted the cash for the $20,000 bill of getting Gonpo here.  Soon after Gonpo's arrival stateside, he began working for Lama in Lama's stonemasonry business in 2008.

The stonemasonry business is seasonal.  Workers generally don't start up until sometime around March or April

---

[1]  Throughout the trial, the parties did not make clear distinctions in testimony, questioning, or argument between Mr. Lama and the limited liability company, and they continue the same tack on appeal.  So we will not distinguish between the two parties either.

[2] The parties interchange the use of "Tibet" and "Nepal," so we do our best to distinguish between the two.

because, any earlier, the ground is still frozen from the New England winter, and things usually end sometime in November or December, when the first snowfall comes.

Hotly in dispute in this case was how many hours per week workers toiled during those in-season months. On the one hand, Gonpo testified that he and his associates worked six days per week (with only Sundays off), with weekly hours totaling about 56 or 57 hours. He lined up testimony from one of his former colleagues that his hours were similar. Lama, though, claims that none of his employees worked more than 40 hours in a week, and he lined up testimony from three of his other employees to that effect. Yet Lama has no timekeeping records to back up that assertion, instead casting blame on his bookkeeper, on whom he relied to handle that part of the business, but who according to Lama turned out to be incompetent and a thief.

Gonpo held his position with Lama's business until the end of the season in 2015, after which he was fired in February 2016. His termination came in the wake of allegations from Lama's then-16-year-old daughter that Gonpo had raped her. After police reports were generated and an investigation concluded, Gonpo was charged in Massachusetts state court. Following a trial he was ultimately acquitted.

Not long after the criminal proceedings were instituted in 2016, Gonpo filed this lawsuit. He brought a host of claims

both on his own behalf and as a putative class action on behalf of other employees similarly situated.[3]  As relevant to our review, his allegations included claims that Lama failed to pay him a minimum wage for all hours worked and failed to appropriately pay overtime, in violation of both the federal Fair Labor Standards Act, 29 U.S.C. §§ 206(a)(1), 207(a)(1), 215(a)(2), and Massachusetts law, Mass. Gen. Laws ch. 149, § 148 and ch. 151 §§ 1A-1B.  Under the applicable statutes of limitations, the relevant time period for Gonpo's claims was from September 2013 through November 2015.

After pre-trial motion practice seeking some advance-of-trial evidentiary rulings (some of which we'll get into shortly), the case was put to a jury over the course of five days. Objections and sidebar conferences abounded during the tense trial, as the parties scrapped over the admissibility of various testimonies and pieces of evidence throughout.  Ultimately, the jury returned a verdict finding for Gonpo.  After some more post-trial motion-practice skirmishes, Lama timely appealed (though his notice of appeal has since become a subject of controversy, which we'll get to soon).

---

[3] No one opted into the class, so the case went to trial as an action by only Gonpo.

- 4 -

**DISCUSSION**

## I.    The Impeachment Evidence

We begin with the district court's exclusion of evidence that Lama's then-16-year-old daughter accused Gonpo of rape just months before Gonpo began to pursue the wage claims at issue here. Pre-trial, Lama moved in limine for permission to introduce evidence of these allegations to show that Gonpo brought this suit to manipulate the rape prosecution and pressure Lama's daughter to drop the case. Gonpo, of course, opposed the introduction of this evidence, contending the evidence was immaterial and subject to exclusion under Rule 403 given its great possibility for prejudice.

After a hearing, the district court denied Lama's motion, thus excluding any evidence of the rape allegations from trial. The district court said that the allegations "appear irrelevant to the [wage] claims," but also recognized that "[i]t is possible that the allegations motivated [Gonpo] to bring this lawsuit" and that they could show that Gonpo had a motive to "fabricate[]" his claims, though calling them "tenuously relevant at best." Nonetheless, the district court found the evidence "incendiary" and concluded it would be "improper, unfair, and unnecessary" to allow the evidence. "Moreover," the district court said, where a plaintiff is entitled to relief, his "motives for bringing suit are immaterial." Lama now calls foul.

Federal Rule of Evidence 404(b) prohibits the introduction of a person's prior crimes or bad acts when used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." This rule is not, however, "an absolute bar" to the admission of prior-bad-acts evidence. United States v. Gentles, 619 F.3d 75, 86 (1st Cir. 2010). Evidence of prior bad acts may be admitted if it passes a two-part test. Id.

First, the bad-act evidence must have "special relevance," meaning that it is not admitted solely to show propensity. United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013). Included in that category of special relevance is evidence designed to "prov[e] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). That list, however, "is not exhaustive." Udemba v. Nicoli, 237 F.3d 8, 15 (1st Cir. 2001). Second, if the evidence has some special relevance, it still must clear the strictures of Rule 403, which provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of," among other concerns, "unfair prejudice." Fed. R. Evid. 403; see Doe, 741 F.3d at 229.

We review the district court's judgment calls on this two-part test for abuse of discretion. See Doe, 741 F.3d at 229. "Within this rubric," though, "abstract legal questions are

- 6 -

reviewed de novo with the understanding that a material error of law is always an abuse of discretion." United States v. Pires, 642 F.3d 1, 10 (1st Cir. 2011). Moreover, on the second part of the test (the balancing act under Rule 403), we have made clear that the district court's discretion is especially broad. "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Doe, 741 F.3d at 229 (cleaned up) (quoting United States v. Li, 206 F.3d 78, 84-85 (1st Cir. 2000)).

Lama first contends that the district court failed to employ our two-step analysis. Rather than grapple with the non-propensity test under Rule 404(b), Lama claims, the district court erroneously concluded that Gonpo's improper motive in bringing this suit was "irrelevant." He styles this error -- the supposed error in failing to apply the two-step test -- a legal one, and thus suggests de novo review applies.

However, we do not read the district court as failing to employ the proper test. Indeed, the court did assess the relevance of the evidence here, but found it "irrelevant" or "immaterial." And although the district court made those comments about motive being immaterial, the court's ruling nonetheless makes clear that the primary basis for its ruling was Rule 403's balancing test.

- 7 -

On that point, the district court considered the relevance of the "possib[ility] that the [rape] allegations motivated [Gonpo] to bring this lawsuit," calling them "tenuously relevant," and acknowledged Lama's argument that they provided motive for Gonpo to "fabricate[]" his claims. But balancing that probative value, the court merely concluded that, "provided how incendiary this evidence is, . . . it would be improper, unfair, and unnecessary" to admit it. The court continued, Gonpo "has the right to have a jury assess his claim without unfair prejudice, regardless of his reasons for asserting it." We thus see the district court as acknowledging the potential probative value of the evidence, but nonetheless finding it excludable under Rule 403. Given that principal basis for its ruling, we next proceed to reviewing the district court's Rule 403 analysis. See United States v. Gilbert, 229 F.3d 15, 22-23 (1st Cir. 2000) (taking the same route).

On the Rule 403 balancing act, Lama does nothing to question the district court's on-the-spot judgment -- rather he attacks only the court's failure to recognize the relevance of the evidence. Even though we are a bit skeptical of the district court's discounted-probative-value analysis under 404(b), we nonetheless find no abuse of discretion in the court's Rule 403 evaluation.[4] See Gilbert, 229 F.3d at 23 ("Although the non-

_____

[4] Our skepticism flows from the district court's characterization of Gonpo's motives for bringing suit here as being

- 8 -

comprehensive nature of the district court's written remarks on the matter leaves us less than entirely confident in its conclusion that the . . . evidence would be unlikely to have any probative value, we are not convinced that relevant matters deserving of significant weight have been overlooked in the course of the court's Rule 403 balancing." (emphases in original) (internal quotation marks, citation, and footnote omitted)).

Rule 403 provides a mechanism to guard against the possibility that "evidence could . . . cause the jury to condemn

---

entirely "irrelevant" or "immaterial." See Pittsley v. Warish, 927 F.2d 3, 10 (1st Cir. 1991) (concluding that charges against the plaintiff were "probative in demonstrating motive and bias" in a civil suit against the police officer who arrested the plaintiff and testified against her at an earlier criminal trial leading to her conviction), overruled in part on other grounds as recognized by Martínez v. Cui, 608 F.3d 54, 63-65 (1st Cir. 2010); accord Heath v. Cast, 813 F.2d 254, 259 (9th Cir. 1987) ("Evidence of Heath's prior arrest, and of his brother's prior misdemeanor convictions, were probative of their bias against the Newport Beach police and of Heath's motive in bringing this action.").

We also share Lama's concern with the district court's citation to Johnson v. King-Richardson Co., 36 F.2d 675, 677 (1st Cir. 1930), in this context. Johnson is not only a case from before the enactment of the Federal Rules of Evidence, it also did not involve the admissibility of evidence. See id. at 676-77. Johnson was an appeal from a dismissal of a suit, and the suit was dismissed at least in part because the district court found that the plaintiff's "motive or purpose in instituting this suit was not in good faith to redress wrongs honestly believed to exist, but to drive the corporation out of business." Id. at 676. We reversed, noting that "[t]he rule generally prevailing is that, where a suitor is entitled to relief in respect to the matter concerning which he sues, his motives are immaterial." Id. As we just suggested, it would be rare that a party's motives for bringing suit would be wholly immaterial to the credibility of their testimony. See Pittsley, 927 F.2d at 10.

- 9 -

a [party] based on passion or bias, for example, which is a no-no." United States v. Jones, 748 F.3d 64, 71 (1st Cir. 2014). As we have explained in the criminal context, Rule 403 is concerned with "a jury that uses that evidence to convict because it is disgusted by the defendant's criminal past rather than convinced that he did the crime charged." Id. Recognizing this possibility, "we have upheld the exclusion of prior bad act evidence in part because it was 'undeniably explosive,'" or "is a 'shocking or heinous crime likely to inflame the jury.'" United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000) (first quoting Gilbert, 229 F.3d at 26; then quoting United States v. Moccia, 681 F.2d 61, 64 (1st Cir. 1982)).

The proposed evidence here is of that cloth. Allegations that Gonpo raped Lama's then-16-year-old daughter would certainly be "explosive" evidence of a "shocking or heinous crime likely to inflame the jury." Id. Those allegations raise the specter that even if the jurors believed that Gonpo had a legitimate wage claim uninfected with bad motive, they might nonetheless find against Gonpo out of disgust for his bad acts -- particularly where finding for Gonpo would foist a financial burden on the family of the alleged victim. And that is precisely the concern that the district court here, aligning with Rule 403, sought to avoid. This

- 10 -

is far from the rare and extraordinarily compelling circumstance where we will reverse that judgment call.[5]

Nor, we note, was Lama's defense entirely hamstringed as he now bemoans. Contrary to Lama's assertion that he was "robbed" of his ability to draw Gonpo's credibility into question, Lama spent time aplenty poking holes in Gonpo's story on cross-examination.[6] For example, Lama tried to muddy Gonpo's credibility by pointing out that on multiple occasions Gonpo's trial testimony about what he was paid was inconsistent with his written discovery and deposition responses. Lama also introduced evidence that called into question other parts of Gonpo's testimony. For instance, Gonpo claimed he never took any vacation breaks, but

_____

[5] Just FYI: Regardless of whether the district court's relevancy ruling was under Rule 404(b) or Rule 401, the soundness of the Rule 403 determination means there was no reversible error.

[6] We acknowledge the important role attacking Gonpo's credibility played to Lama's defense. Because Lama's bookkeeper apparently failed to keep records, Gonpo was entitled to a burden-shifting instruction under Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–88 (1946). Mt. Clemens provides that where an employer fails to keep adequate records, the employee can meet her FLSA burden by "prov[ing] that [s]he has in fact performed work for which [s]he was improperly compensated and . . . produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." Id. at 687. When the worker does so, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." Id. at 687–88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result [may] be only approximate." Id. at 688.

Lama introduced contradictory testimony that Gonpo did in fact take time off for various religious events or holidays. Further, Lama got Gonpo to concede during cross-examination that all of the workers followed the same schedule, and then during his defense brought in three other employees who said they didn't work the 57-hour schedule Gonpo claims to have done. And Lama further attacked Gonpo's credibility when during cross-examination, Lama questioned Gonpo about wiring money he made back to his family in Tibet, which according to Lama, totaled more than Gonpo claimed to have been paid by Lama in certain years. Not to mention Gonpo conceding during cross that he was canned from his job for something that "had nothing to do with the work" -- a detail that suggested Gonpo had some motive to fabricate his claims. In short, Lama had other opportunities, using less incendiary evidence, to marshal a robust defense.

## II. Colleague's Testimony and Related Evidence

Lama next claims error in the district court's admission of testimony, along with documentary evidence, from one of Gonpo's former colleagues, Jamyang Gyatso.

Before we dive into these issues, we begin with a brief procedural recap. Gyatso testified (over objection) at trial concerning his own experience working for Lama from 2008 to 2013, the last year of which overlapped with Gonpo's work during the

relevant limitations period. As part of that testimony, Gyatso testified, as relevant here, that:

- he worked with Gonpo on some projects;

- he usually worked approximately 57 hours per week;

- he kept a pocket calendar (the 2012 version of which was introduced into evidence) to record his hours and then submitted the calendar to Lama to be paid; and

- Lama did not pay him timely or at the overtime rate he earned, instead keeping a balance of overtime hours worked and wages owed that never got compensated.

Lama raised a score of objections to this testimony and evidence at different stages in the litigation. Starting before trial, Lama moved in limine to exclude Gonpo from admitting testimony concerning Lama's pay practices as to other employees. The district court reserved ruling on the objection until trial, at which point the parties again jockeyed over the evidence. Before Gyatso took the stand, Lama objected that testimony from Gyatso concerning his own work experience and the hours he worked would present inadmissible 404(b) prior-bad-acts evidence. Responding, Gonpo contended the evidence went to corroborate his own story of hours worked and amounts paid, and suggested it was admissible as evidence of Lama's business practice. In retort,

Lama argued Gyatso's testimony was "not being offered" to establish the business practice and stressed that Lama's business practice was not at issue in the case. The district court overruled the objection and allowed Gyatso to testify.

But that was not the end of it. Lama objected again when Gonpo sought admission of Gyatso's pocket calendar, which, according to Gyatso, reflected his recording of the hours he worked in the 2012 season. Again, Lama protested that Gyatso's statements of what he worked were "not relevant" to testify to Lama's business practices. When the district court suggested the pocket calendar was admissible under Rule 406 as evidence of Lama's business practice, Lama again had two rejoinders. First, he claimed the evidence could not demonstrate business practices in 2013 (during the limitations period) because Gyatso supposedly testified that the business practices changed that year. And second, he argued that Gyatso's "own subjective recording of time in a period that precedes the statutory claim period is not relevant and i[s] prejudicial." Sticking to its Rule 406 musing, the district court again overruled the objection.

On appeal wielding a hatchet instead of a scalpel, Lama claims that the entirety of Gyatso's testimony, as well as his pocket calendar recording his 2012 work hours, are inadmissible under either Rule 406 or Rule 404(b).

**A.    Appellate Jurisdiction**

Before we can get to the merits of these particular challenges, Gonpo interposes a procedural roadblock:  Unlike the claims already discussed, he says we lack jurisdiction to review these district-court evidentiary rulings because Lama's notice of appeal did not include them in the list of orders appealed.

Under the Federal Rules of Appellate Procedure, a notice of appeal must "designate the judgment -- or the appealable order -- from which the appeal is taken."  Fed. R. App. P. 3(c)(1)(B) (effective Dec. 1, 2021).[7]  We can exercise jurisdiction over those orders "fairly raised within th[e] notices."  <u>Constructora Andrade Gutiérrez, S.A.</u> v. <u>Am. Int'l Ins. Co.</u>, 467 F.3d 38, 44-45 (1st Cir. 2006).

Under the rules in effect at the time that Lama filed his notice of appeal, there were two ways a notice of appeal could designate the appellate issues.  <u>Denault</u> v. <u>Ahern</u>, 857 F.3d 76, 81-82 (1st Cir. 2017).  First, the simple way:  identify the final judgment and that's it.  When a party did that, we said the notice "encompasses not only that judgment, but also all earlier interlocutory orders" since those earlier orders "merge in the judgment."  <u>United States ex rel. Booker</u> v. <u>Pfizer, Inc.</u>, 847 F.3d

---

[7] The version in effect before December 1, 2021, provided that an appellant had to "designate the judgment, order, or part thereof being appealed."  Fed. R. App. P. 3(c)(1) (2019).

- 15 -

52, 55 (1st Cir. 2017) (quoting John's Insulation, Inc. v. L. Addison & Assocs., Inc., 156 F.3d 101, 105 (1st Cir. 1998)). Second, the riskier option: itemize the individual rulings you wanted to appeal from. See Denault, 857 F.3d at 81. But we warned litigants before: That approach is "perilous." Id. If, on appeal, we found "it clear that the object of th[e] [appellate] challenge was not presciently included in the itemized list of rulings appealed, we will have no jurisdiction to consider the challenge." Id.

This case poses a slightly different conundrum. Gonpo is correct that Lama itemized certain interlocutory rulings in his notice of appeal. And Gonpo is correct that Lama did not specify the district court's decisions on Gyatso's testimony and pocket calendar in that list. But that wasn't all the notice did. Lama's notice of appeal also said that he was appealing from the final judgment, in which -- at least theoretically -- those decisions would have merged.

We have treated this scenario a bit schizophrenically in the past. Compare Booker, 847 F.3d at 55 (finding jurisdiction because "[w]hile the notice did specify certain other orders issued by the district court, it also specified the court's May 26, 2016 final judgment disposing of the case"), with Denault, 857 F.3d at 82 (finding no jurisdiction because the order challenged in briefing was not among the itemized list, even though the notice

of appeal identified the "Amended Judgment" in that list)[8], and Constructora Andrade Gutiérrez, 467 F.3d at 44-45 (finding no jurisdiction from an itemized list even though the notice of appeal specified the "final amended judgment")[9].

Rule 3 was, however, amended effective December 1, 2021. See Order Adopting Amendments to the Federal Rules of Appellate Procedure at 3 (2021), https://www.supremecourt.gov/orders/court orders/frap21_9p6b.pdf [hereinafter "Order Adopting 2021 Amendments"]. The amendments came to the fore as a result of the advisory committee's recognition of a host of jurisdictional "traps" the Rule had littered about for all but the savviest litigants. See Fed. R. Civ. P. 3, advisory committee's notes to the 2021 amendment [hereinafter "Rule 3 2021 Committee Notes"]. As the committee put it, a "notice of appeal is supposed to be a simple document that provides notice that a party is appealing and invokes the jurisdiction of the court of appeals" -- "[i]t is the role of the briefs, not the notice of appeal, to focus the issues on appeal." Id.

---

[8] See Notice of Appeal, Denault v. Ahern, Civil No. 14-13687 (D. Mass. Nov. 20, 2015), ECF No. 147.

[9] See Notice of Appeal, Constructora Andrade Gutiérrez, S.A. v. Am. Int'l Ins. Co., Civil No. 99-1811 (D.P.R. Aug. 3, 2005), ECF No. 132; Am. Notice of Appeal, Constructora Andrade Gutiérrez, Civil No. 99-1811 (D.P.R. Aug. 11, 2005), ECF No. 134.

The amendments helped further that general principle in a few ways, two of which deserve a highlight here. One part of the amendment alerts parties to the merger rule we just discussed above, telling them that "[t]he notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order," and instructing them that "[i]t is not necessary to designate those orders in the notice of appeal." Fed. R. App. P. 3(c)(4); see also Rule 3 2021 Committee Notes (specifying that the amendment "does not attempt to codify the merger principle but instead leaves its details to case law"). And, as most pertinent here, the Rule also now provides that "[a]n appellant may designate only part of a judgment or appealable order by expressly stating that the notice of appeal is so limited." Fed. R. App. P. 3(c)(6). But, it makes clear, "[w]ithout such an express statement, specific designations do not limit the scope of the notice of appeal." Id.

As the committee notes to the amendment explain, the new express-statement requirement of subsection (c)(6) was designed specifically to counteract cases like Denault and Constructora Andrade Gutiérrez. The committee recognized that some appellants, "due to misunderstanding or a misguided attempt at caution," designate in their "notices of appeal . . . both the judgment and some particular order that [they] wish[] to challenge on appeal." Rule 3 2021 Committee Notes. However, the committee also saw that

- 18 -

a number of courts (including us at times) have concluded that the designation of some orders (even in addition to the final judgment) in the notice of appeal meant that other interlocutory orders not specified were unreviewable -- even though the merger rule would ordinarily provide that the other interlocutory orders merged in the also-appealed-from final judgment. See id. The express-statement requirement of subsection (c)(6), the committee says, removes this "trap for the unwary," while also leaving the door open for those parties who still wish to deliberately limit their notices. Id.; see also Fed. R. App. P. 3(c)(6).

Now, the notice of appeal here was filed months before the amendments to Rule 3 went into effect on December 1, 2021. See Order Adopting 2021 Amendments at 3. But the 2021 amendments to the Rules of Appellate Procedure provide that they operate not only in cases newly filed after their effective date -- they also "shall govern . . . , insofar as just and practicable, [in] all proceedings then pending." Id. We've added our own gloss on that requirement with similar rules amendments, noting that before applying a rule's amendment retroactively we must also consider whether doing so would "otherwise work a 'manifest injustice.'" Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 n.4 (1st Cir. 2011) (quoting Silva v. Witschen, 19 F.3d 725, 728 (1st Cir. 1994)).

There would be nothing unjust or impracticable about applying the amendments to Rule 3 retroactively here, nor would there be any manifest injustice. For one thing, we see no prejudice that Gonpo could have suffered from having to defend the issues here on the merits notwithstanding Lama's inartful drafting of the notice of appeal. Gonpo claims that, since the notice of appeal delineated certain orders, he focused on the issues specifically identified in preparing to defend the appeal. But had Lama identified only the final judgment, Gonpo "would have learned exactly which orders [Lama] wished to challenge in [his] appeal no sooner than [he] did here." See Comité Fiestas De La Calle San Sebastián, Inc. v. Soto, 925 F.3d 528, 532 (1st Cir. 2019). And Gonpo ultimately defended the merits of Lama's newly enumerated challenges in his first-filed appellate brief. See Schroeder v. McDonald, 55 F.3d 454, 459–60 (9th Cir. 1995) (finding no prejudice in the retroactive application of Fed. R. App. P. 4(a)(4) where the parties briefed the issues on the merits); cf. Caribbean Mgmt. Grp. v. Erikon LLC, 966 F.3d 35, 41 (1st Cir. 2020) (exercising jurisdiction over the merits of the underlying order where the party appealed only from the motion for reconsideration since the appellee was not prejudiced by the defect and the briefs defended the order on the merits). For another, refusing to apply Rule 3 retroactively would prove especially unjust considering our circuit's inharmonious caselaw on this particular genre of notice

- 20 -

of appeal under the old version of Rule 3.  The drafters of Rule 3's amendment recognized as troublesome this "trap for the unwary," and our circuit's trap was a particularly perilous one.

Applying the newly minted Rule 3(c)(6), we conclude that Lama's notice of appeal -- specifying both the final judgment and some interlocutory orders -- does not prohibit him from challenging other interlocutory orders not specifically enumerated in the notice of appeal.  See Fed. R. App. P. 3(c)(6).  Had he wished to "so limit" his notice, Lama would have been required to state expressly "that the notice of appeal was [so] limited."  Id.; Rivera v. Kress Stores of P.R., Inc., 30 F.4th 98, 107 (1st Cir. 2022).  Yet nothing in Lama's notice reflects an "express statement" limiting the notice of appeal to these orders, particularly in light of his separate designation of the final judgment, in which the challenged evidentiary rulings on Gyatso's testimony and accompanying documentary evidence merged.  See Booker, 847 F.3d at 55.  We thus have jurisdiction to consider Lama's challenges to these orders.

## B.  Merits

Turning to the merits, Lama raises on appeal three qualms with the admission of Gyatso's testimony and the pocket-calendar evidence.  We take each contention in turn.

## 1.   Inadequate evidence of routine

Lama first contends, as he did below, that this evidence was inadmissible as habit or routine-practice evidence under Rule 406.  Rule 406 provides that "[e]vidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."  Fed. R. Evid. 406.  The reasoning is that habits (as opposed to character evidence) reflect "the person's [or organization's] regular practice of responding to a particular kind of situation with a specific type of conduct."  McCormick on Evidence § 195 (8th ed. 2020).  That specificity renders habit evidence of "greater probative value than . . . evidence of general traits of character."  Id.; see also 2 Weinstein's Federal Evidence § 406.02 (2021) ("Habit evidence is more probative than character evidence because an individual's habitual behavior is more consistent than behavior based on character.").

"Although there are no 'precise standards' for determining whether a behavior pattern has matured into a habit, two factors are considered controlling as a rule:  'adequacy of sampling and uniformity of response.'"  United States v. Newman, 982 F.2d 665, 668 (1st Cir. 1992) (quoting Fed. R. Evid. 406, advisory committee's notes).  We apply that standard because "[t]h[o]se factors focus on whether the behavior at issue 'occurred

- 22 -

with sufficient regularity making it more probable than not that it would be carried out in every instance or in most instances.'" Id. (quoting Weil v. Seltzer, 873 F.2d 1453, 1460 (D.C. Cir. 1989)). Thus, "[i]t is essential," we have said, "that the regularity of the conduct alleged to be habitual rest on an analysis of instances 'numerous enough to support an inference of systematic conduct and to establish one's regular response to a repeated specific situation.'" Id. (cleaned up with new alteration added) (quoting Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 511 (4th Cir. 1977)). It is the party seeking to admit the routine-practice or habit evidence that bears the burden of demonstrating its sufficiency. Id. And our appellate review is again only for abuse of discretion. Id.

Lama's objections under Rule 406 to Gyatso's testimony and the pocket calendar are twofold. First, according to Lama, Gyatso did not testify about any of Lama's business practices or patterns since Gyatso testified only as to his own work experience with Lama. Thus, there was "no evidence" of sampling or uniformity to qualify as routine-practice evidence under Rule 406. Second, Lama protests that the pocket calendar could not be evidence of a routine during the limitations period since Gyatso testified that his use of the calendar changed in 2013.

We begin with his first contention. At trial, Lama protested that Gyatso's testimony of his own experience was "not

relevant . . . to testify as to the payment practices of the employer."[10]  To the extent that objection raised an issue with the adequacy of the sampling or uniformity of response, we nonetheless still find Lama's appellate arguments without merit.[11]

The district court rejected Lama's inadmissibility argument, telling Lama that Gyatso's testimony "goes to establishing the business practice."  And Lama had no response then, and again has none now, as to why Gyatso's testimony could not be at least a building block of Rule 406 evidence.  Indeed, though not entirely precise, Gyatso's testimony can be reasonably understood as describing Lama's business practice concerning the pocket-calendar recording and submission of time worked from his employees:  "[W]e record when we started and when we left."  And

---

[10] We note also that Lama was not clear on any distinctions he drew between the various aspects of Gyatso's testimony or the pocket calendar in lodging his objections at trial.  Instead, Lama moved at trial to exclude the entirety of Gyatso's testimony, and he employs the same wholesale-exclusion tactic on appeal.

[11] We caution counsel that objections to evidence in the district courts must be specific in order to preserve them, as we have made it clear that a general objection to testimony is insufficient to preserve more specific ones.  See United States v. Young, 105 F.3d 1, 9 & n.3 (1st Cir. 1997); United States v. Piva, 870 F.2d 753, 759-60 (1st Cir. 1989) ("Although he contended that the evidence was hearsay and that it was being improperly used to rehabilitate Pacheco's testimony, counsel did not argue at trial that the evidence was inadmissible because it was made after the declarant had acquired a motive to fabricate.  This lack of specificity, after the judge believed she had resolved the objection, precludes appellant from raising this issue for the first time before us.").

the method of keeping track of work hours in this way was corroborated by both Gonpo as well as another employee called to the stand by Lama -- meaning there was testimony from 3 employees in a company of less than 15 employees. Similarly, both Gonpo and Gyatso testified to working approximately 57-hour weeks -- meaning again that 2 out of less than 15 employees testified to their repeated work schedule. And the same goes for Gonpo's and Gyatso's testimonies that Lama routinely did not pay employees the full amount they worked or at an overtime rate, but instead "carried forward" a balance of excess hours and wages from week to week which were never compensated.

Lama makes no effort on appeal to explain why testimony from those proportions of a small company's employees as to their weekly schedule, their practice for recording and submitting their time, and Lama's pay practices -- practices conducted week after week for at least two years -- is insufficient under Rule 406. Instead, focusing only on Gyatso, he simply ignores the entirety of the evidence admitted to establish the business practice and contends there was "no evidence" of other employees' experiences or practices. And he cites to dissimilar cases involving either the experiences of one or two individuals in relation to thousands of other potential experiences, see G.M. Brod & Co. v. U.S. Home Corp., 759 F.2d 1526, 1533 (11th Cir. 1985) (one person's experience insufficient "when considered in the light of Home's

contractual dealings with thousands of small subcontractors"), or in two isolated events occurring three years apart, see Becker v. ARCO Chem. Co., 207 F.3d 176, 197, 204 (3d Cir. 2000).[12]

Finally, although Lama may believe that other employees' testimonies showed that Gonpo's and Gyatso's sizings up of the business routines were not accurate, which testimony to believe was a credibility call left to either the judge or the jury to determine. See 23 Charles Alan Wright & Arthur B. Miller, Federal Practice & Procedure § 5277 (2d ed. 2022) (noting the unsettled question of when an issue as to the sufficiency of the habitual or routine conduct is raised, whether the judge should make a preliminary determination of admissibility, or if it should be left for the jury to weigh).

In all, Lama fails to offer a developed or coherent argument why -- based on the facts actually revealed at trial -- the district court abused its discretion in finding Rule 406's sampling-and-uniformity test satisfied here to establish Lama's routine practices. See Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

His second argument merits little ink. Though Lama claims (as he did below) that Gyatso testified that the business

---

[12] To make crystal clear, our conclusion is limited to deciding that, on the facts of this case (considering especially the small size of the business at issue), Lama has shown no abuse of discretion.

routine changed in 2013, the only change Gyatso testified to was that Lama kept the pocket calendar instead of returning it. The district court rejected this as being a salient difference below, and Lama had no responsive argument then, nor has he come up with a cohesive one now, as to why the district court's analysis on that piece was off-base.[13]

## 2. Irrelevance

Next, Lama appears to contend that the district court erroneously admitted the pocket calendar because the calendar did not cover any time period within the limitations period here (September 2013-November 2015) and thus was not "relevant." He raised this issue below, preserving abuse-of-discretion review, but to the extent Lama injected only a relevancy objection under Rule 401, we spy no error.[14]

---

[13] Lama also slips an argument deep into his brief that Gonpo's counsel maintained in his closing argument that other employees were paid off the books in cash, which Lama says was "not based on any evidence." Yet a complaint that a closing argument was not supported by the evidence raises a wholly different error than a complaint that certain evidence was improperly admitted. Lama did not object to this closing-statement remark, leaving it forfeited and thus reviewed, at most, for plain error. See Smith v. Kmart Corp., 177 F.3d 19, 25 (1st Cir. 1999). And Lama also makes no argument on appeal under that demanding standard, leaving the argument ultimately waived. See Covidien LP v. Esch, 993 F.3d 45, 56 (1st Cir. 2021).

[14] Lama tries to loop this in as an objection under Rule 406, but we struggle to see how this fits there.

- 27 -

Rule 401 "set[s] a very low bar for relevance." United States v. Rodríguez-Soler, 773 F.3d 289, 293 (1st Cir. 2014). Under that rule, "if the evidence has 'any tendency' to make a material fact more or less likely, it is relevant." Id. (emphasis in original); see Fed. R. Evid. 401. That low threshold makes "a relevancy-based argument . . . a rather tough sell." Franchina v. City of Providence, 881 F.3d 32, 49 (1st Cir. 2018).

Color us unsold.[15] The evidence Lama protests easily vaults the low relevancy bar. Gyatso testified that his schedule in 2013, the period he worked with Gonpo covered by the limitations period here, was the same as his schedule in 2012, the period that the calendar covered.[16] The calendar thus served to corroborate Gyatso's testimony that he worked about 57 hours per week in 2013 by pointing to documentary evidence supporting that he had in fact worked those same hours in the past. See United States v. Pérez-González, 445 F.3d 39, 47 (1st Cir. 2006) (documentary evidence corroborating witnesses' testimony passes Rule 401's loose test).

---

[15] We note that Lama's arguments on this point, citing no caselaw and not even a rule of evidence, are so underdeveloped that they may even be waived. See Conduragis v. Prospect Chartercare, LLC, 909 F.3d 516, 518 (1st Cir. 2018); United States v. Freitas, 904 F.3d 11, 21 (1st Cir. 2018).

[16] Lama contends in his brief that there is no evidence that Gyatso worked for Lama in 2013, since Gyatso testified that he "left somewhere like 2013 in December, 2012." But Gyatso also later testified that he returned to work for Lama in May 2013 at Lama's request and, as Lama recognizes, also testified about how he kept track of and submitted his time in 2013.

### 3. Prior bad acts

Finally, Lama claims that Gyatso's testimony, even if it was admissible under Rule 406, "implicate[d]" Rule 404(b) (which we discussed above) as prior-bad-acts evidence and thus faults the district court for failing to employ the two-step 404(b) analysis. As best we can tell, the prior bad acts involved here are Gyatso's testimony that Lama did not timely pay him for all of his hours, or for the overtime pay he earned.[17]  But, since (as we just discussed) that evidence was admissible under Rule 406, the district court committed no error in failing to conduct a Rule 404(b) analysis.  That is so because "Rule 404(b) does not prevent admission of evidence of other acts under Rule 406, if the other acts establish that the person made a habit of such conduct."  2 Weinstein's Federal Evidence § 404.12 (2021).

Contending otherwise, Lama cites to caselaw noting that "[t]he admissibility of Rule 406 evidence is . . . controlled by the overriding provisions of Rule 403." Maynard v. Sayles, 817 F.2d 50, 53 (8th Cir.), vacated, 831 F.2d 173 (8th Cir. 1987) (en banc).  But although Rule 403 may be step two of the two-step test under Rule 404(b), that does not mean that Rule 406 evidence must

---

[17] To the extent Lama contends that other parts of Gyatso's testimony constituted prior-bad-acts evidence, we cannot identify how that is so from the record or his briefs, and thus deem any argument on those points waived.

also meet Rule 404(b)'s first-step requirements.[18]  Indeed, Rule 403 applies in all different evidentiary contexts.  See, e.g., United States v. Tetioukhine, 725 F.3d 1, 6 (1st Cir. 2013) ("This evidence, even if it passes the requirements of Rule 702, remains subject to Rule 403's balancing test."); Martínez, 608 F.3d at 59 (same for Rule 415, even though that rule "supersede[s] Rule 404(b)'s prohibition on . . . propensity [evidence] in sexual assault cases").  And Lama identifies no authority to otherwise support his contention that because Rule 403 applies, so, too, does Rule 404(b).

To be sure, we remain mindful that because Rule 406 evidence "necessarily engenders the very real possibility that such evidence will be used to establish a party's propensity to act in conformity with its general character," it could "thereby thwart[] Rule 404's prohibition."  Simplex, Inc. v. Diversified Energy Sys., Inc., 847 F.2d 1290, 1293 (7th Cir. 1988).  But that is why we apply a high standard for evidence to be admissible under Rule 406.  See id.; see also Newman, 982 F.2d at 668; McCormick on Evidence § 195 (8th ed. 2022) (discussing the general distinctions between inadmissible evidence of character and admissible evidence

---

[18] As a reminder, that two-step process involves:  (1) identifying, under Rule 404(b), any "special relevance" of the bad-acts evidence; and then (2) assessing, under Rule 403, whether the probative value of the evidence "is substantially outweighed by a danger of," among other concerns, "unfair prejudice."  Doe, 741 F.3d at 229.  For more details, see our earlier discussion.

of habit or routine); 2 <u>Weinstein's Federal Evidence</u> § 406.02 (2021).[19]

## CONCLUSION

All told, we **affirm**. The parties shall bear their own costs.

---

[19] Because we find no error, we need not address Lama's argument (citing our caselaw in the criminal habeas context) that the evidentiary errors here (in a federal civil trial) violated his right to due process. <u>See</u> <u>Coningford</u> v. <u>Rhode Island</u>, 640 F.3d 478, 484 (1st Cir. 2011) (noting that "a misbegotten evidentiary ruling [in a state criminal trial] that results in a fundamentally unfair trial may violate due process").